## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

---

In re:                                          Court File No. 09-33020

     JetChoice II, LLC,

          Debtor.                      Chapter 7 Case
                                       Judge Gregory F. Kishel

---

DFG Capital L.L.C.,

          Plaintiff,

vs.                                             ADV. NO. 10-_____

Nauni Jo Manty, in her capacity as Trustee for
JetChoice II, LLC,
Lighthouse Management Group, LLC, and
JetChoice I, LLC,

          Defendants.

---

## COMPLAINT

---

DFG Capital L.L.C., by and through its legal counsel, Fabyanske, Westra, Hart & Thomson, P.A., as and for its Complaint against Defendants Nauni Jo Manty, in her capacity as the Trustee for JetChoice II, LLC, and Lighthouse Management Group, LLC, in its capacity as the Receiver for JetChoice I, LLC, and JetChoice I, LLC, based on actual knowledge and information and belief, states and alleges as follows:

### PARTIES

1.     Plaintiff DFG Capital L.L.C. ("DFG" or "Plaintiff") is a limited liability company organized under the laws of the State of Delaware with its principal place of business located at

1

90 South Seventh Street, Suite 4300, Minneapolis, Minnesota 55402. DFG is a member of JetChoice II, LLC and a creditor of Jet Choice II, LLC's bankruptcy estate.

2.      Defendant Nauni Jo Manty is the Chapter 7 Trustee (the "Trustee") of JetChoice II, LLC, a limited liability company formed under the laws of the State of Minnesota ("JetChoice II" or "Debtor").

3.      Defendant Lighthouse Management Group, LLC ("Lighthouse") is a receiver (the "Receiver") appointed by the Ramsey County Court for JetChoice I, LLC ("JetChoice I"), a limited liability company formed under the laws of the State of Minnesota.

4.      Defendant JetChoice I, LLC, is a limited liability company formed under the State of Minnesota. Jet Choice I acted as an administrative agent on behalf of, and for the benefit of JetChoice II.

## PROCEDURAL BACKGROUND

5.      On May 1, 2009, JetChoice I filed a voluntary petition for relief under Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Minnesota, Court File No. 09-33024 (the "Jet Choice I Bankruptcy Case"). The Jet Choice I Bankruptcy Case is currently pending before this Court.

6.      On May 1, 2009, JetChoice II filed a voluntary petition for relief under Chapter 7 of Title 11 of the Bankruptcy Code in Court File No. 09-33020 (the "Jet Choice II Bankruptcy Case").

7.      On May 4, 2009, this Court appointed Defendant Nauni Jo Manty as Trustee for JetChoice II. BKY 09-33020 [Dkt. No. 3].

8.      On May 11, 2009, Associated Bank filed a Motion for Relief from the Automatic Stay in the JetChoice I Bankruptcy Case. BKY 09-33024 [Dkt. No. 7]. Associated Bank asserted that it held a perfected first-priority security interest in all assets of JetChoice I,

2

including all accounts receivable, and sought relief from the automatic stay to pursue collection of the accounts receivable. This Court granted Associated Bank's motion on May 26, 2009. BKY 09-33024 [Dkt. No. 12].

9.      On June 23, 2009, the trustee for JetChoice I, Mary Jo A. Jensen-Carter, filed a Notice of Abandonment indicating her intent to abandon certain property of JetChoice I, including "receivables from affiliates which are probably not collectable . . . ." BKY 09-33020 [Dkt No. 22]. The JetChoice I trustee based her decision to abandon the property in part on her determination that the value of the accounts receivable and other assets being abandoned was significantly less than the balance due to Associated Bank under its perfected security interest. The order approving abandonment of the accounts receivable was entered on July 27, 2009. BKY 09-33020 [Dkt. No. 24].

10.      On or about October 2, 2009, DFG received a letter from Ricke & Sweeney, P.A., as counsel for JetChoice I and Lighthouse demanding payment of $87,310.83 for —services rendered and delivered . . . ." These accounts receivable represent monthly fees owed by members of JetChoice II. It is the position of the JetChoice II Trustee that the accounts receivable are due and owing to JetChoice II as property of the JetChoice II bankruptcy estate.

11.      On or about November 18, 2009, Rickey & Sweeney, P.A., as counsel for JetChoice I, served upon DFG a summons and complaint alleging that DFG owed JetChoice I the sum of $87,310.83 for account stated and breach of contract and seeking relief for damages in that amount, together with interest, costs, and disbursements.

12.      On January 20, 2010, JetChoice I filed the aforementioned summons and complaint in the Second Judicial District of Minnesota, Ramsey County Court File No. 62-CV-10-417. Since filing the summons and complaint, Jet Choice I has narrowed its claims after it confirmed that its alleged unpaid invoices did not exceed $36,655.88.

13. On April 15, 2010—nearly five months after JetChoice I commenced the action against DFG—Judge J. Thomas Mott entered an order in the Second Judicial District of Minnesota, Ramsey County Court File No. 62-CV-10-2106, appointing Lighthouse as the Receiver over the assets of JetChoice I, including all accounts receivable and their proceeds.

14. On September 21, 2010, Defendant Nauni Jo Manty, as Trustee for JetChoice II, notified all JetChoice II members and counsel, including Plaintiff DFG, that she had advised counsel for Lighthouse that any efforts by Lighthouse to collect JetChoice II receivables is a violation of the automatic stay pursuant to 11 U.S.C. § 362(a) and that Lighthouse must cease any such collection efforts.

## JURISDICTION

15. This Court has subject matter jurisdiction of this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and Local Rule of Bankruptcy Procedure 1070-1. The claims asserted herein arise under the Bankruptcy Code and are related to cases pending before this Court pursuant to the Bankruptcy Code.

16. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§157(b)(2)(A) and (O).

17. Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## NATURE OF THE PROCEEDING

18. The Plaintiff brings this adversary proceeding against Defendants seeking a declaration of its rights and interests under sections 542(b), and 553 of the Bankruptcy Code pursuant to Federal Rule of Bankruptcy Procedure 7001(2) and (9) and to preserve property of the Debtor for the equitable administration of the bankruptcy estate.

19.     Defendant JetChoice I sued Plaintiff DFG in state court seeking a judgment that necessarily involves an interest in property of Debtor JetChoice II and that will directly affect the orderly and equitable administration of the Debtor's estate.

20.     Plaintiff DFG seeks a determination in this Court that the accounts receivable that JetChoice I claims it is owed are in fact property of the estate of JetChoice II so that any amount due and owing by DFG is payable to, or on the order of, the estate of JetChoice II. Such determination will eliminate any potential for Plaintiff to be held liable twice for the same debt.

<u>**FACTUAL BACKGROUND**</u>

**I.      The JetChoice I Accounts Receivable**

21.     This adversary proceeding seeks to establish as property of the bankruptcy estate of Debtor JetChoice II certain accounts receivable (the "Accounts Receivable") in which JetChoice I claims an interest. Any interest of JetChoice I, however, is in the nature of a legal right only to collect the Accounts Receivable on behalf of JetChoice II.

22.     JetChoice II owns and leases aircraft for the use by, and benefit of, JetChoice II members (the "Members").

23.     JetChoice I is in the business of managing aircraft operations, maintenance, and administration, and overseeing flying programs.

24.     On August 5, 2003, JetChoice II and JetChoice I entered into a Management Agreement (the "Management Agreement") whereby JetChoice agreed to retain JetChoice to provide management services to JetChoice II's aircraft operations and flying program. A true and correct copy of the Management Agreement is attached hereto as **Exhibit A**.

25.     Under the terms of the Management Agreement, JetChoice II retained all operational control as well as possession, command, and control of all aircraft and for all

operations under the scope of the Management Agreement. **Exhibit A.** JetChoice I acted only as an administrative agent on behalf of, and for the benefit of, JetChoice II.

26.     In addition to providing other specified management and administrative services to JetChoice II under the Management Agreement, JetChoice I was to "[d]irectly bill and collect hourly usage, monthly service and incidental fees from [JetChoice II] Members . . . . " **Exhibit A.** Paragraph 1(f) of the Management Agreement also directed JetChoice I to "collect monthly surcharge fees to be deposited in the JetChoice II account. . . ." **Exhibit A.**

27.     Paragraph 6(c) of the Management Agreement provides that JetChoice I shall receive "[a]ll hourly usage, monthly service and incidental fees collected from Members of [JetChoice II] remaining after remitting to [JetChoice II] funds sufficient to pay for all aircraft leases entered into by [JetChoice II]" **Exhibit A.**

28.     As of the Petition Date, JetChoice II owed a total of $4,416,480 in payments for unexpired aircraft leases listed on its Schedule F – Creditors Holding Unsecured Non-Priority Claims (the "Schedule F") filed in the JetChoice II Bankruptcy Case. [BKY 09-33020, Dkt. No. 1].

29.     JetChoice I listed "Accounts Receivable-Trade (Includes JetChoice II, LLC A/R Scheduled in Related Case)" of $2,995,563.00 on the Schedule B – Personal Property (the "Schedule B") filed on May 1, 2009 with the voluntary Chapter 7 petition in the JetChoice I Bankruptcy Case [BKY 09-33024, Dkt. No. 1].

30.     On June 9, 2009, JetChoice I amended its previously filed Schedule B to reflect an "(Amended Amount) Accounts Receivable-Trade (Includes JetChoice II, LLC A/R Scheduled in Related Case)" of $2,472,207.00 (the "Amended Schedule B"). [BKY 09-33024, Dkt. No. 14]

31.     Even assuming that the entire $2,472,207.00 of JetChoice I on its Amended Schedule B represents fees owed by JetChoice II Members for their use of JetChoice II aircraft

6

and subject to collection by JetChoice I under the Management Agreement, there are no remaining funds after satisfying the outstanding lease obligations of JetChoice II as listed on its Schedule F. The Management Agreement explicitly requires JetChoice I to remit such funds to JetChoice II, creating in JetChoice II an equitable ownership interest in the Accounts Receivable held by JetChoice I as the collection agent for JetChoice II without retaining any ownership in the underlying proceeds of the Accounts Receivable.

32.     To the extent that any portion of the $2,472,207.00 listed as Accounts Receivable by JetChoice I on its Amended Schedule B represents amounts due from JetChoice II Members for their use of JetChoice II aircraft pursuant to the Member Control Agreement with JetChoice II, including any such amount owed by DFG, the Accounts Receivable are, and should be declared, the property of the bankruptcy estate of JetChoice II.

33.     As a result of the foregoing, any amount due and owing by DFG should be paid to, or on the order of, the Trustee as property of the Debtor's estate.

**II.     JetChoice II Breach of a Master Lease**

34.     On October 29, 2004, JetChoice II and DFG entered into a Master Lease, whereby DFG leased a Dassault Falcon 50 aircraft to JetChoice II. A true and correct copy of the Master Lease is attached hereto as **Exhibit B.**

35.     According to the terms of the Master Lease, JetChoice II was responsible for repair and maintenance. **Exhibit B**, ¶ 14.

36.     Also, upon termination of the Master Lease, JetChoice II was required to return the aircraft to DFG, "fresh from a 'C' inspection and clear from any routine maintenance for a period of 30 days, 60 flight hours, and 60 flight cycles." **Exhibit B,** ¶ 13(a).

37.     On April 16, 2009, JetChoice II informed DFG that it was terminating operations.

38.     JetChoice II failed to perform the required "C" inspection.  Such termination of operations and failure to perform the required "C" inspection and other maintenance obligations was a breach of the Master Lease.

39.     DFG has been damaged in an amount of $500,524.21 for JetChoice II's failure to perform the "C" inspection and other required maintenance obligations under the Lease.

40.     On January 10, 2011, DFG filed a Proof of Claim in this Bankruptcy Case for $500,524.21.

41.     Any amount of the Accounts Receivable administered by JetChoice I as the collection agent for JetChoice II, or any other amount due and owing by DFG and payable to the Trustee, as determined by this Court, should be offset against DFG's claim in this Bankruptcy Case.

## COUNT I – DECLARATION OF PARTIES' RIGHTS AND INTERESTS
## [11 U.S.C. § 542(b)]

42.     The Plaintiff realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein.

43.     The Accounts Receivable listed on the Schedule B for JetChoice I that represent amounts owed to JetChoice II by JetChoice II Members for their use of JetChoice II aircraft constitute property of the JetChoice II estate to be recovered and administered by the Trustee pursuant to section 541 of the Bankruptcy Code.

44.     As a result of the foregoing, pursuant to section 542(b) of the Bankruptcy Code, the Trustee is entitled to the payment by Plaintiff of any and all amounts due and owing to JetChoice I that represent fees incurred by JetChoice II Members for their use of JetChoice II aircraft.

45.     As a result of the foregoing, pursuant to section 542 of the Bankruptcy Code, the Trustee is also entitled to an accounting of all such Accounts Receivable collected by JetChoice I.

## COUNT II – RIGHT OF SETOFF

46.     DFG realleges and incorporates by reference the preceding paragraphs of the Complaint as if fully set forth herein. Because of JetChoice II's breach of the Master Lease, DFG has been damaged in an amount of $500,524.21.

47.     The $500,524.21 therefore constitutes an allowed unsecured claim against the Debtor's estate that must be setoff against any amount due and owing JetChoice II for outstanding aircraft user fees.

**WHEREFORE**, the Plaintiff respectfully requests this Court enter judgment in favor of Plaintiff and against the Defendants as follows:

A.     On Count I – Declaration of Parties' Rights and Interests, declaring that (a) the outstanding Accounts Receivable of JetChoice I constitute property of the estate of JetChoice II, and (b) any amount due and owing from Plaintiff DFG is to be paid to, or on the order of, the Trustee of Debtor JetChoice II;

B.     On Count II – Right of Setoff, (a) preserving the right of setoff for Plaintiff DFG's unsecured claim against the estate of Debtor JetChoice II, and (b) declaring that the right of setoff shall be unaffected by the determination in Count I above;

C.     Ordering JetChoice I to cease and desist all collection efforts against DFG in the case venued in Ramsey County District Court (Court File No. 62-CV-10-417); and

D.     Granting the Plaintiff such other, further, and different relief as the

Court deems just, proper, and equitable.

Dated: February 15, 2011          **FABYANSKE, WESTRA, HART & THOMSON, P.A.**

By:    /s/ Megan M. Kennedy
        Paul L. Ratelle (#127632)
        Jeffrey W. Jones (#311418)
        Megan M. Kennedy (#389359)
        800 LaSalle Avenue, Suite 1900
        Minneapolis, MN 55402
        (612) 359-7600
        (612) 359-7602 (facsimile)
        **ATTORNEYS FOR DFG CAPITAL L.L.C.**

# MANAGEMENT AGREEMENT

THIS MANAGEMENT AGREEMENT ("Agreement") is made as of the $\underline{5}$ day of August 2003, between JetChoice I, LLC ("JetChoice I") and JetChoice II, LLC ("Company").

WHEREAS, Company owns or leases aircraft for the benefit of its membership; and

WHEREAS, JetChoice I has expertise in pilotage, maintenance and administration of aircraft, and is in the business of managing aircraft and overseeing flying programs.

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth herein, as well as other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties agree, as follows:

1) **Appointment and Services.** While Company hereby agrees to retain JetChoice I to provide management services to Company, Company shall retain operational control as well as possession, command and control of all aircraft and for all operations under the scope of this agreement, subject only to the safety decisions of the pilot in command and the JetChoice I Director of Operations. All operations shall be conducted under Federal Aviation Regulations Part 91. The management services provided shall include, without limitation, the following (collectively referred to as "Services"):

   a) Provide key executives to serve as managers of Company to oversee all of the day-to-day finances and operations of Company in compliance with the terms of the Articles of Organization, Operating Agreement and Member Control Agreement of the Company;

   b) Enter into any and all contracts on behalf of the Company needed to operate the Company;

   c) Arrange for the purchasing, leasing and selling of aircraft on behalf of Company;

   d) Arrange for the sale of new Membership Units in the Company and coordinate and approve the transfer of issued Membership Units to third parties;

   e) Create new programs and classes of Membership Units within the Company;

   f) Directly bill and collect hourly usage, monthly service and incidental fees from Members of the Company. Also, collect monthly surcharge fees to be deposited in the JetChoice II account and to be used for purposes of making aircraft lease payments, and/or making aircraft purchases.

   g) Assess a fuel surcharge to Members of the Company in accordance with the terms of the Member Control Agreement;

EXHIBIT

A

tabbies

h) Employ, schedule and provide flight crews for all aircraft owned by, leased by or made available for use by Company. JetChoice I shall be responsible for the training, qualification and proficiency of all flight crews;

i) Schedule all flight operations for all aircraft owned by, leased by or made available for use by Company;

j) Arrange for the hangaring, maintenance, and insurance of all aircraft owned or leased by the Company;

k) Determine the appropriate purchase price for a new Membership Unit in the Company and the related fees to be charged to new Members of the Company from time to time and establish aircraft usage fee schedules for such new Members;

l) Ensure full compliance with all applicable laws of the United States Department of Transportation, the Federal Aviation Administration, Canadian Transport Authority, State of Minnesota, and all other governmental authorities which govern all aircraft owned by, leased by or made available to Company; ensure compliance in its operations with and completion of required maintenance on all leased and purchased aircraft in accordance with all FAR Part 91 or FAR Part 135 regulations (whichever is applicable), the manufacturer's maintenance manual, and all other applicable regulations.

m) Manage all employment matters, including hiring and supervision of employees and employee performance evaluations;

n) Provide quarterly financial and management reports to members regarding Company operations; and

o) Set and accrue capital maintenance reserve levels for each aircraft type, to be accrued on an hourly basis, and solicit board approval for such levels.

p) Arrange for and procure insurance, including but not limited to all leased or purchased aircraft, as follows:

1. Hull and replacement insurance minimum for the aircraft purchase price;
2. Workers Compensation insurance for employees; and
3. Aircraft and liability insurance of $100,000,000.00.

JetChoice I shall produce Certificate(s) of Insurance at the request of any Member of the Company.

2) **Purchase and Lease of Aircraft.** JetChoice I intends to arrange long-term leases of all aircraft on behalf of the Company. The Company will collect reserves from JetChoice I for capital maintenance and engine work, and will be responsible for funding capitalized maintenance and major engine repairs. Repair for long term items including

landing gear and c-checks will be accounted for on a prorated basis of the average mean time to repair within the context of the lease length—for example, if there is a five year lease and a ten year mean time to repair, the Company will be responsible for 50% of the repair cost. The leasing of aircraft by the Company is intended to eliminate the need for individual members to personally guarantee aircraft loans, among other things.

Company hereby agrees that JetChoice I:

a) May at its discretion search for aircraft suitable for purchase or lease by the Company to meet member flying requirements;

b) May at its discretion perform and engage third parties to inspect aircraft prior to lease or purchase;

c) May at its discretion negotiate purchase prices and contract terms for any and all aircraft purchases; and

d) May arrange for aircraft leases on behalf of JetChoice II with entities in which David N. Kloeber, Jr. owns an interest.

Notwithstanding anything herein to the contrary, JetChoice I shall have no authority, whether express, implied, or of any other kind or nature, to purchase aircraft on behalf of the Company or to bind the Company with respect to the purchase of aircraft.

Notwithstanding anything contained herein to the contrary, JetChoice I shall submit, prior to execution, all contracts to lease or purchase aircraft to the Board of Governors of the Company for review and approval. The Board of Governors of the Company may, in it sole discretion, either approve or reject the execution and performance of any such contract.

3) **Use of Aircraft.** Company hereby agrees that JetChoice I has restricted use of Company aircraft and will bear the cost of operating the aircraft for the following purposes:

a) Providing demonstration flights for purposes of marketing and selling new Units or programs in the Company;

b) Use by Company paid spokespersons; and

c) JetChoice II business.

d) When using Company aircraft for approved purposes, JetChoice I will promptly pay for all direct operating expenses of the aircraft including fuel, pilots and any incidental use fees including airport fees and taxes, and will compensate JetChoice II at a fair market hourly dry lease rate for each hour flown based on the aircraft type flown, including aircraft engine reserves based on the hourly rate paid to Honeywell

for their MSP program. Dry lease and engine reserve payments are to be made with cash or check within thirty days of aircraft use.

4) **Operational Control.** Company shall, for all flights conducted under this agreement, be responsible for and retain full and complete Operational Control over the aircraft. JetChoice I will provide pilotage and specified management services only. Company shall have complete authority to initiate, conduct or terminate any flight under this agreement, subject only to safety decisions of the pilot-in-command.

5) **Term.** The services of JetChoice I hereunder shall be continuous commencing on the date of this Agreement and continuing until termination by JetChoice I or the Company pursuant to Section 10 hereunder.

6) **Management Fee.** In consideration for the Services provided above, JetChoice I shall receive the following fees:

   a) A 12.5% fee from the Company, based on the Membership Fees paid by Members.

   b) A 12.5% fee from the Selling Member, based on the Transaction Price or value of an existing Unit being resold or transferred by a Member to a new Member. For purposes of this fee, the term "Transaction Fee" shall mean the difference between the Membership Fee paid by the Selling Member and the price for the Membership Units sold to the new member.

   c) All hourly usage, monthly service and incidental fees collected from Members of the Company remaining after remitting to the Company funds sufficient to pay for all aircraft leases entered into by the Company.

7) **No Joint Venture.** The parties agree that any employees utilized by JetChoice I shall be employees of JetChoice I and not of Company. The parties further agree that this Agreement does not give either party the right to obligate the other party, unless expressly provided for herein, without that party's express written consent nor does this Agreement constitute a joint venture or partnership between the parties. As to any employees providing services hereunder, JetChoice I shall pay the appropriate social security, FICA, and employment taxes for its employees and its employees shall not be entitled to any benefits, vacations, or other consideration from Company.

8) **Non-Exclusivity.** It is agreed and understood that this Agreement is not exclusive and that JetChoice I may establish companies or cooperatives similar to Company in local and national markets or engage in charter business, among other things, without the consent or approval of Company.

9) **Confidentiality.** Company and JetChoice I and their owners, governors, directors, officers and employees shall carefully guard and maintain the secrecy of any and all confidential information which shall or may concern the customers, pricing, employees, suppliers, financial date and business and affairs of each business acquired as a result of this Agreement, and shall at no time either during the term of this Agreement or

thereafter, directly or indirectly, disclose any such confidential information to any person, firm, corporation, or other entity or its representatives, or use the same in any manner other than in connection with the business and affairs of either, unless it shall first secure mutual consent. All such confidential information shall be and remain the property of each business respectively. This provision shall not apply to information which becomes public through no action of Company and/or JetChoice I or to disclosure pursuant to a subpoena or other governmental order or demand.

10) **Termination.** Either party may terminate this contract in the event that either party fails to perform its obligations hereunder, or upon the dissolution of Company. Both parties agree that in the event either party fails to perform its obligations, it will issue a written notice of default to the other party. If the cure of such default is not effected within 30 days, the other party may terminate this contract except, in the case of termination by the Company, upon the further condition of approval of such termination by 2/3 or greater vote of the Board of Governors of the Company.

11) **Ownership of Name.** Company understands and agrees that the name "JetChoice I" and "JetChoice" and all related trademarks and logos (the "Marks") are the property of JetChoice I and that in the event of a termination of this Agreement for any reason, Company will promptly cease using the Marks and change the registered name of Company with the Minnesota Secretary of State and wherever else registered on behalf of Company.

12) **Binding Effect.** Except as otherwise provided herein, this Agreement shall be binding upon and inure to the benefit of the parties and their successors and permitted assigns

13) **Applicable Law; Jurisdiction.** This Agreement shall be governed by and construed in accordance with the laws of the State of Minnesota. Hennepin County District Court, in the State of Minnesota, shall have the sole and exclusive jurisdiction over any dispute arising between the Company and JetChoice I.

14) **Severability.** If any provision of this Agreement is held to be illegal, invalid, or unenforceable under the present or future laws effective during the term of this Agreement, such provision will be fully severable; this Agreement will be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of this Agreement; and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement. Furthermore, in lieu of such illegal, invalid, or unenforceable provision, there will be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid, and enforceable.

15) **No Third Party Beneficiary.** This Agreement is made solely and specifically among and for the benefit of the parties hereto, and their respective successors and assigns, and no other person will have any rights, interest, or claims hereunder or be entitled to any

benefits under or on account of this Agreement as a third party beneficiary or otherwise.

16) **Notices.** Any notice to be given or to be served upon the JetChoice I or any party hereto in connection with this Agreement shall be in writing and delivered personally and mailed by certified mail, return receipt requested, postage prepaid, and shall be directed to the parties at the addresses set forth at the end of this Agreement or at such other addresses as the parties may give notice of in the manner provided herein.

17) **Consent and Waiver.** No consent under and no waiver of any provision of this Agreement on any one occasion shall constitute a consent under or waiver of any other provision on such occasion or on any other occasion, nor shall it constitute a consent under or waiver of the consented-to or waived provision on any other occasion. No consent or waiver shall be enforceable unless it is in writing and signed by the party against whom such consent or waiver is sought to be enforced.

18) **Entire Agreement.** This Agreement constitutes the entire agreement among the parties regarding the subject matter hereof. This Agreement supersedes any prior agreement or understanding among them, and it may not be modified or amended in any manner other than as set forth herein.

19) **Amendment.** Neither this Agreement nor any provisions hereof shall be modified, discharged or terminated except by an instrument in writing signed by the party against whom any waiver, change, discharge or termination is sought.

20) **Miscellaneous.** In any action to enforce the terms and conditions of this Agreement, the prevailing party shall be entitled to recover its costs and expenses, including reasonable attorneys' fees. The remedies herein provided shall be in addition to any and all other remedies available by law.

IN WITNESS WHEREOF, the parties have duly executed this Management Agreement as of the day and year first above written.

JETCHOICE I, LLC ("JETCHOICE I")        JETCHOICE II, LLC ("COMPANY")

By: _____        By: _____

Its: _____        Its: _____

8/5/03

2364106v2                                             6

# AIRCRAFT LEASE AGREEMENT

REGARDING

# DASSAULT FALCON 50
# SERIAL NUMBER 25

BETWEEN

DFG CAPITAL L.L.C.
(LESSOR)

AND

JETCHOICE II, LLC
(LESSEE)

AS OF _October 29_ , 2004

THIS AIRCRAFT LEASE AGREEMENT IS AND AT ALL TIMES SHALL REMAIN SUBJECT AND
SUBORDINATE IN ALL RESPECTS TO THE SECURITY INTEREST IN THE AIRCRAFT GRANTED TO
FIRST UNION COMMERCIAL CORPORATION ("SECURED PARTY") PURSUANT TO THAT CERTAIN
AIRCRAFT SECURITY AGREEMENT DATED AS OF THE ___ DAY OF OCTOBER, 2004 AMONG FIRST
UNION COMMERCIAL CORPORATION, DFG CAPITAL L.L.C. AND MINNESOTA CHOICE AVIATION IV,
LLC, (THE "SECURITY AGREEMENT"). SECURED PARTY SHALL HAVE THE RIGHT AT ALL TIMES
NOTWITHSTANDING THIS LEASE TO ENFORCE THE TERMS AND PROVISIONS OF THE SECURITY
AGREEMENT, WITHOUT LIMITATION, REPOSSESSION OF THE AIRCRAFT.

L1

EXHIBIT

_B_

tabbies®

# AIRCRAFT LEASE AGREEMENT

THIS AGREEMENT is entered into effective as of the _____ day of October 2004 by and between DFG Capital L.L.C., a Delaware limited liability company, owner of a 50% undivided interest (the "Interest") in the subject aircraft, hereinafter referred to as "Lessor" and JetChoice II, LLC, a Minnesota Limited Liability Company, operator of subject aircraft, hereinafter referred to as "Lessee".

1. Property Leased. Lessee hereby leases from Lessor and Lessor hereby leases to Lessee the Interest in the following property ("Aircraft"):

    Aircraft Make and Model:   Dassault Falcon 50 Model
    Manufacturer's Serial #:   25
    FAA Registration Number: N502EZ
    Engine Make and Model:  Garrett AiResearch Model TFE-731-40
    Engine Serial #'s:          115393, 115394, and 115395

Lessee hereby acknowledges delivery and acceptance of the aforesaid Aircraft Interest upon the terms and conditions of this Lease, together with all equipment and accessories attached thereto or used in connection therewith.

2. Term.

    (a) Term. Subject to Section 3 of this Lease, the term of the Lease shall commence on the delivery date and shall continue until the 31st day of December, 2009. Unless earlier terminated, and subject to Section 3 of this Lease, Lessee has the option to extend, under the same conditions and considerations, this Lease for a period of 6 additional years. Lessee shall provide notice of its agreement to extend the lease six calendar months prior to the end of the term. If such notice is not provided, the option to extend shall expire.

    (b) Early Termination. Notwithstanding any of the provisions contained within this Aircraft Lease Agreement, Lessor may terminate this Lease upon closing of the option contained in 4.1 or 4.2 of the Co-Ownership/Buy-Sell Agreement dated as of the _____ day of October, 2004, by and between Lessor and Co-Owner (as hereinafter defined) attached hereto as Appendix C (the "Buy-Sell Agreement"). Lessor shall notify Lessee in writing of the notice of intent to exercise said option within seven (7) days of receipt of such notice from one of its Members. In the event DFG Capital L.L.C. terminates its Membership Interest, it will not owe any further Membership Fee, nor any further Monthly Fees that would otherwise be payable under the terms of the Membership Purchase Agreement.

3. Coordination with Other Aircraft Owners. All undivided interests in the Aircraft not owned by Lessor ("Additional Interests") are owned by Minnesota Choice Aviation IV, LLC, a Delaware limited liability company ("Co-Owner"). It shall be a condition concurrent to Lessor's obligation to lease and deliver the Interest to Lessee, and Lessee's obligation to lease and accept delivery of the Interest from Lessor, that Co-

Owner shall simultaneously lease and deliver the Additional Interests to Lessee, and that Lessee shall lease and accept delivery of the Additional Interests from Co-Owner. In the event Lessee fails to acquire a leasehold interest in the Additional Interests, this Lease shall be null and void. Further, contrary provisions of this Lease notwithstanding, in the event Lessee's leasehold interest in the Additional Interests shall terminate for any reason, this Lease shall simultaneously terminate.

4. Consideration.

(a) Basic Rent. Commencing on the Delivery Date, Lessee shall pay to Lessor as Basic Rent the amount of "Basic Rent" set forth in Annex A hereto on each Basic Rent Date during the Term.

(b) MSP. Lessor hereby warrants that at delivery of the Aircraft to Lessee, the Engines are current, fully paid and in good standing under the Honeywell Maintenance Service Plan (MSP) and are enrolled thereunder in the name of the Lessor. After delivery of the Aircraft to Lessee under this Lease, Lessee shall pay, without reimbursement from Lessor, all payments and charges due thereunder, including usage fees, for the three Engines combined (all such amounts owed under the MSP, the "MSP Payments") either to Lessor or to the MSP provider, as directed by Lessor, and Lessee shall be solely responsible for accomplishing and paying for all scheduled and unscheduled maintenance and repair of the Engines. Lessee may, on Lessor's behalf, obtain services under the MSP, to the extent available, with respect to Engine maintenance and repair arising during the Term. Throughout the Term, Lessee shall comply with all requirements of the MSP in order to maintain the Engines in good standing at all times under the MSP.

(c) Other Maintenance. Lessee shall be responsible for scheduling, supervising, and monitoring all scheduled and unscheduled maintenance relating to the Aircraft, including without limitation airframe, systems, avionics, APU, inspection and other items in addition to the Engine maintenance referenced in Section 4(b). Lessee shall bear the cost of all such maintenance out of its own funds and shall not charge Lessor therefor.

(d) Remittance. All payments of Rent due hereunder shall be made in United States Dollars by wire transfer or by Company Check so as to be received by at the place of payment on the day in question by deposit to the account listed below, or to such other account as Lessor may from time to time, upon reasonable notice, direct to Lessee in writing. If any payment shall be due on a day, which is not a Business Day, it shall be due on the next succeeding Business Day.

Address
Address
ABA # XXXXXXXXX
For the Acct of: DFG Capital L.L.C.
Acct Number: XXXXXXXXXX

(e) Security Deposit.  No security deposit shall be required in conjunction with this Lease.

5. Construction of the Lease.  This Lease shall be construed according to the laws of Minnesota, regardless of the place where the leased property is to be used and operated. The Lessee shall have no right to consent to any mechanic's nor storage or salvage lien or liens except as provided by the law of the place where such services, storage or materials are supplied, and any such liens placed as a result of the Lessee's actions shall be removed at the cost and expense of the Lessee, who shall defend, indemnify, and hold harmless the Lessor against any such lien or liens and the charges underlying those liens.

6. Lessor's Duties.

(a)  Lessor hereby acknowledges its obligation to deliver the Aircraft in an airworthy condition.  Lessee agrees that by acceptance of the Aircraft at the beginning of the Term, it has agreed the Aircraft was delivered in an airworthy condition.  Aircraft shall be delivered to the Lessee, at a mutually agreeable location, not more than 30 days removed from a "C" inspection.  Aircraft shall have a valid Standard Airworthiness Certificate, all mandatory Airframe Directives and mandatory Service Bulletins complied with, and shall have no extensions or overdue items covered under the Manufacturer's Maintenance Program.

(b)  All Aircraft records, including but not limited to, logbooks, flight manuals, work orders, invoices, serviceable tags and CAMP records (or a similar substitute) shall be current and up to date and shall be delivered to Lessee at time of delivery of the Aircraft.

(c)  Unless earlier terminated in accordance with its terms, Lessor warrants that during the Term of this Lease, and throughout any further extensions thereto, if no Event of Default has occurred and is continuing, Lessee's quiet enjoyment of the Aircraft shall not be interrupted by Lessor or anyone claiming through or under Lessor.

7.  Default.  The occurrence of any of the following events or conditions shall constitute an Event of Default:

(a)  Any failure or neglect of the Lessee to pay the rental herein agreed at any time specified herein shall constitute a default entitling the Lessor to terminate this Lease upon three (3) days notice in writing;

(b)  Any breach or failure of either party to observe or perform any other term, condition or agreement required to be observed or performed by such party which is not corrected within 10 days after written notice from the other party;

(c)  The insolvency or bankruptcy of either party or of JetChoice I, LLC, or the making by either party of any assignment for the benefit of creditors, or the consent of either party to the appointment of a trustee or receiver for a substantial part of such party's property, or the voluntary assignment or transfer by either party of its interest in the Lease or of substantially all of its property. A transfer in ownership of the Aircraft

pursuant to Section 4.1 or 4.2 of the attached Buy-Sell Agreement shall not constitute a "transfer" under this paragraph.

8. REMEDIES FOR DEFAULT. Upon the occurrence of any event of default, or in the event either party has otherwise materially breached the terms of this Agreement, the following remedies may apply:

(a) In the event of default by Lessee, Lessor may, upon written demand, cause Lessee to return promptly, and Lessee shall return promptly, the Aircraft to Lessor or its order. In such case, Lessee shall return the Aircraft in the same condition and order as set forth in Section 6 hereof as if Lessee had the delivery duties specified therein.

(b) In the event of default by Lessee, Lessor may sell all or any part of the Aircraft at public or private sale, as Lessor may determine, or otherwise dispose of, hold, use, operate, lease to others or keep idle the Aircraft as Lessor, in its discretion, may determine, all free and clear of any rights of Lessee.

(c) In the event of default by either party, the other party may exercise any right or remedy which may be available to it under applicable law.

(d) Anything to the contrary notwithstanding, in the event of default by Lessee, Lessor may immediately terminate Lessee's right of possession of the Aircraft under this Lease. Upon such termination of Lessee's right of possession, all right and interest of Lessee to the use and operation of the Aircraft shall terminate and Lessor, with or without notice to Lessee and with or without legal process, may, directly or through its agent, enter upon the premises of Lessee or other premises where the Aircraft may be located and take possession of the Aircraft (any damages occasioned by such taking of possession of the Aircraft being hereby expressly waived by Lessee).

9. Use of the Aircraft by Lessee.

(a) Lessee may use the Aircraft from time to time in accordance with the applicable FAA regulations appropriate for the type of operations conducted and provisions of the insurance policy or policies in force relating to the Aircraft.

(b) Lessee shall have no restrictions on the number of flight hours the Lessee is permitted to fly through the duration of the lease.

(c) Lessee shall be solely responsible for any fines, penalties and forfeitures occasioned by any violation of the aforementioned provisions.

10. Alterations, Modifications, and Improvements. Lessee shall obtain Lessor's written consent prior to making any alterations, modifications, or customization to the Aircraft. Any such action must be performed in compliance with all applicable federal, state, and local rules and regulations governing or affecting aircraft. Lessee reserves the right to refurbish the paint and interior of the Aircraft to maintain the appearance of the Aircraft up to the condition of the Aircraft at delivery. The cost of such refurbishment shall be borne by the Lessee.

11.  Operational Control.  Lessee, shall for all times the Aircraft is used by Lessee under this agreement, be responsible for, and shall retain, full and complete operational control over the Aircraft, and shall purchase and otherwise provide such fuel, oil and other supplies and services as are required or appropriate for the operation of the Aircraft. Unless an Event of Default has occurred or an option has been exercised pursuant to Sections 4.1 or 4.2 of the Buy-Sell Agreement , Lessor agrees that at no time will it interfere with the operation of the Aircraft.  All pilot services will be arranged for by Lessee and are separate from this Lease.  Lessor will have no control over any flight crew arranged for by Lessee and will accept all decisions or judgments of the Lessee appointed Pilot-in-Command, Director of Operations, and Director of Maintenance with respect to operations of the Aircraft as final.

12.  Title to Aircraft.  The Lessor shall retain the title to the Aircraft Interest and Co-Owner shall retain title to the Additional Interests, Lessee being in possession as Lessee only and not as purchaser and claiming no right, title or interest otherwise.

13.  End of Lease Obligations.  The Lessee shall, at the end of the Lease, any early termination of the Lease, or any extension thereof, return the Aircraft pursuant to the following conditions:

     (a)  Airframe.  Aircraft shall be returned to the Lessor and Co-Owner, at a mutually agreeable location, fresh from a "C" inspection and clear from any routine maintenance for a period of 30 days, 60 flight hours, and 60 flight cycles.  Aircraft shall be in the same condition, normal wear and tear excepted, as at time of delivery, shall have a valid Standard Airworthiness Certificate, all Airframe Directives and mandatory Service Bulletins issued during the period of the Lease complied with, and shall have no extensions or overdue items covered under the Manufacturer's Maintenance Program.

     (b)  Engines.  MSP shall have been paid up to the times accumulated on the engines at the return location.  Engines shall be airworthy and within acceptable performance margins established by the Manufacturer.

     (c)  Records.  All Aircraft records, including but not limited to, logbooks, flight manuals, work orders, invoices, serviceable tags and CAMP records (or a similar substitute) shall be current, complete and up to date and shall be delivered to Lessor at time of return of the Aircraft.

14.  Repairs and Maintenance.  Lessee shall, at its own cost and expense, maintain the Aircraft in a good and safe operating condition in accordance with the applicable FAA regulations, aircraft maintenance manual provisions, determinations by the Director of Maintenance of the Lessee, and periodically as required.  The Lessee agrees to indemnify and hold harmless the Lessor and its officers, managers, directors, members, agents, and owners from any liability arising out of the negligent operation, repair and maintenance of said Aircraft performed by organizations not related to or otherwise part of the Lessor or Lessee or their assigns, or liability arising out of the work while it is being performed by vendors for the Lessor or Lessee.  Lessee shall keep the Aircraft in as good and safe operating condition as when delivered by the Lessor to Lessee, ordinary wear and tear from use and ordinary deterioration excepted.  Costs and expenses of Engine or airframe maintenance and repair, including those which relate to

accident, abuse, misuse, warranty claims or insured events and that which exceed the coverage under the MSP shall be the responsibility of the Lessee and are not subject to reimbursement by Lessor or credit against payments due hereunder.

15. Insurance.

(a) Lessor hereby directs, and Lessee agrees to arrange for and obtain at Lessee's expense with insurers of recognized reputation, responsibility and having at least an A.M. Best rating of an "A" or better:

(i) aircraft physical damage insurance (including war risk coverage and other allied perils coverage) in accordance with the requirements of Section 6.2 of the Security Agreement (as hereinafter defined) (A) with no deductible with respect to the Aircraft, against loss, theft, or damage, extended coverage with respect to any engines or parts while removed from the Aircraft, on the agreed upon value basis of the Aircraft ($12,200,000), (B) naming JetChoice I, LLC and JetChoice II, LLC as named insureds and naming Lessor and its members and its members' affiliates as additional insureds, (C) establishing that insurer shall coordinate and settle any claim through Lessor and that claims payments shall be made to Lessor and not named insured and (D) providing a blanket waiver of subrogation from insurer in favor of Lessor and its members and its members' affiliates; and

(ii) passenger and third party liability insurance (including war risk coverage and other allied perils coverage) in accordance with the requirements of Section 6.2 of the Security Agreement for the Aircraft which it operates (A) in an amount not less than Two Hundred Million Dollars ($200,000,000) combined single limit coverage, (B) naming JetChoice I, LLC, JetChoice II, LLC as named insureds and naming Lessor, and its members and its members' affiliates as additional insureds and (C) including "products and completed operations" coverages and, "non-owned aircraft liability, including contractual liability" coverages.

(b) Lessee shall arrange and provide for war risk and other allied perils coverage described in (a) above in accordance with the requirements of Section 6.2 of the Security Agreement (as hereinafter defined) for physical damage to the Aircraft in an amount not less than the agreed value set forth above, passenger liability in an amount not less than Two Hundred Million Dollars ($200,000,000) combined single limit liability coverage and third party bodily injury and property damage liability in an amount not less than Fifty Million Dollars ($50,000,000).

(c) Copies of such policies and certificates of insurance shall be furnished to the Lessor concurrently with the execution of this Agreement. Such insurance shall be maintained in full force and effect by Lessee (and JetChoice I, LLC) throughout the term hereof and insurer shall provide Lessor thirty days advance notice of cancellation or material alteration. In the event there is any conflict between Section 15 of this Lease and Section 6.2 of the Security Agreement, the provisions of Section 6.2 of the Security Agreement shall control. Lessee shall cause JetChoice I, LLC to agree in

writing (either in a separate agreement or by amendment to the Management Agreement between JetChoice I, LLC and Lessee) to the provisions of this Section 15.

(d)  For purposes of this Leases, Lessor's affiliates shall mean: (i) Lessor's members, including Dougherty Financial Group LLC ("DFG") and (iii) DFG's employees, officers, directors and members (iii) subsidiary companies of DFG which are managed by DFG or the voting rights of which are owned 50% or more by DFG or an intermediate subsidiary of DFG and (iv) their guests and invitees.

16.  Pilotage.  Lessee shall permit the Aircraft to be operated only by currently certified pilots who meet all requirements of the aforesaid insurance and applicable law.

17.  Taxes.  During the continuation of this Lease, the Lessee shall pay or cause to be paid applicable Federal Excise Tax, Segment Fees, Usage Taxes, Metropolitan Aircraft Commission Fees, and any tax, license, or lease charges for the use of any airport or facilities and for use of premises occupied in forced landings when the Aircraft is used by the Lessee.

18.  Registry.  Lessor shall deliver the Aircraft with a valid and current registration from the State of Minnesota, Office of Aeronautics.  Lessee, at its own expense, throughout the duration of the lease, shall renew and update the Aircraft registration as required by the State of Minnesota, Office of Aeronautics.

19.  Notices.  All notices herein shall be deemed served if hand delivered or sent by telefax, express courier, or United States certified mail, return receipt, postage prepaid, to Lessor and Lessee at their respective addresses set forth below or to such other address as the respective parties hereto shall from time to time designate in writing to the other party:

|         |                          |
|---------|--------------------------|
| **Lessor:** | DFG Capital L.L.C.<br>90 South Seventh Street<br>Suite 4300<br>Minneapolis, MN  55402<br>Fax:   612-376-4040 |
| **Lessee:** | Jet Choice II, LLC<br>350 Alpha Lane<br>Minneapolis, MN<br>Phone 651-225-1900<br>Fax 651-225-1906 |

20.  Entire Agreement.  This Lease constitutes the entire agreement between the parties hereto.  Revisions and attachments may be made to this Lease in writing approved by both parties, and these approved attachments shall then become part of the Lease.  The failure of either party to strictly enforce any provisions of this Lease shall not be construed as a waiver thereof or as excusing the other party from future performance.

L1

21   Subordination.  This Lease is and at all times shall remain subject and subordinate in all respects to the security interest in the Aircraft granted to First Union Commercial Corporation ("Secured Party") pursuant to that certain Aircraft Security Agreement dated as of the ___ day of October, 2004 (the "Security Agreement"). Secured Party shall have the right at all times notwithstanding this Lease to enforce the terms and provisions of the Security Agreement, including, without limitation, repossession of the Aircraft.

22.   Books and Records; Confidentiality.

(a) Lessee covenants and agrees (i) that the books and records of Lessee and its affiliate JetChoice I, LLC, shall be maintained in accordance with generally accepted accounting principles in such a manner that they may be readily audited, (ii) that Lessee shall provide to Lessor on a monthly basis copies of Lessee's and JetChoice I, LLC's balance statement, income and expense statements, and other financial reports, and (iii) that Lessor shall have the right, at any time during ordinary business hours and at all other reasonable times, to examine, audit, and copy the books and records of Lessee and JetChoice I, LLC relating to the Aircraft and/or the financial condition of Lessee and JetChoice I, LLC, and/or to cause such books and records to be examined, audited, and copied by a certified public accountant or other person chosen and paid by Lessor.

(b) The balance statement, income and expense statements, other financial reports, and any other information obtained during the course of any examination or audit of the books and records of Lessee and JetChoice I, LLC shall be "Confidential Information." Any other nonpublic information furnished to Lessor that Lessee or JetChoice I, LLC designates as being confidential or which, under the circumstances surrounding disclosure, ought to be treated as confidential shall also be designated as Confidential Information.

(c) Lessor acknowledges that it is the policy of both Lessee and JetChoice I, LLC to maintain the secrecy and confidentiality of all Confidential Information. Lessor shall not disclose any Confidential Information to anyone other than critical internal employees of Lessor, or accountants and attorneys employed by Lessor. Lessor shall take reasonable security precautions, at least as great as the precautions it takes to protect its own confidential information, to prevent outside disclosure of the Confidential Information. Lessor may only disclose Confidential Information to Lessor's employees, accountants or attorneys on a need-to-know basis. Lessor shall execute appropriate written agreements with its employees and consultants sufficient to enable it to comply with all the provisions of this Agreement.

(d) Lessor shall notify Lessee and/or JetChoice I, LLC, as appropriate, immediately upon discovery of any unauthorized use or disclosure of Confidential Information and will cooperate with Lessee and JetChoice I, LLC in every reasonable way to help Lessee and JetChoice I, LLC regain possession of the Confidential Information and prevent its further unauthorized use.

(e) Lessor will not use the Confidential Information to directly or indirectly engage in, own, manage, operate, provide financing to, control or participate in the

ownership, management or control of, or otherwise have an interest in, or aid or assist anyone else in the conduct of, any business that competes, directly or indirectly, with Lessee or JetChoice I, LLC, or is otherwise engaged in activities likely to be competitive with Lessee or JetChoice I, LLC.

(f)  Lessor shall return all originals, copies, reproductions and summaries of Confidential Information at the request of the Lessee or JetChoice I, LLC.

(g) Lessor acknowledges that monetary damages may not be a sufficient remedy for unauthorized disclosure or use of Confidential Information and that Lessee and/or JetChoice I, LLC shall be entitled, without waiving any other rights or remedies, to such injunctive or equitable relief as may be deemed proper by a court of competent jurisdiction.

23.  TIME IS OF THE ESSENCE IN THIS LEASE AND ALL OF ITS PROVISIONS.

24.  TRUTH IN LEASING.

Lessor:       DFG Capital L.L.C.
              90 South Seventh Street
              Suite 4300
              Minneapolis, MN  55402
              Fax:   612-376-4040

Lessee:       JetChoice II, LLC
              350 Alpha Lane
              St. Paul, MN 55107
              651-225-1900

(SEE FEDERAL AVIATION REGULATION [FAR] 91.23).  THE AIRCRAFT BECAME SUBJECT TO THE MAINTENANCE REQUIREMENTS OF PART 91 OF THE FEDERAL AVIATION REGULATIONS UPON THE REGISTRATION OF THE AIRCRAFT WITH THE FAA.  LESSOR CERTIFIES THAT DURING THE PERIOD SUBSEQUENT TO ITS ACQUISITION OF TITLE TO THE AIRCRAFT PRECEDING THE EXECUTION OF THIS LEASE, THE AIRCRAFT HAS BEEN MAINTAINED AND INSPECTED UNDER PART 91 OF THE FARS.  LESSEE CERTIFIES THAT THE AIRCRAFT WILL BE MAINTAINED AND INSPECTED UNDER PART 91 OF THE FARS FOR OPERATIONS TO BE CONDUCTED UNDER THIS LEASE.  UPON EXECUTION OF THE LEASE, AND DURING THE TERM HEREOF, LESSEE, WHOSE NAME AND ADDRESS ARE NOTED ABOVE CERTIFIES THAT LESSEE SHALL BE RESPONSIBLE FOR THE OPERATIONAL CONTROL OF THE AIRCRAFT UNDER THIS LEASE.  LESSEE FURTHER CERTIFIES THAT IT UNDERSTANDS ITS RESPONSIBILITIES FOR COMPLIANCE WITH THE APPLICABLE FARS.  AN EXPLANATION OF THE FACTORS BEARING ON THE OPERATIONAL CONTROL AND PERTINENT FARS CAN BE OBTAINED FROM THE NEAREST FEDERAL AVIATION ADMINISTATION FLIGHT STANDARDS DISTRICT OFFICE.

IN WITNESS WHEREOF, the parties have executed this Agreement at St. Paul, Minnesota this 29th day of _October_ 2004.

Lessor:  **DFG Capital L.L.C.**

By: _____

Name: _____

Title: _____

Date: _____


Witness: _____

Date: _____

Lessee:  **JetChoice II, LLC**

By: _____

Name: _Dave Kreeger Jr_

Title: _Chief MGR_

Date: _10·28·04_


Witness: _____

Date: _10-28-04_

IN WITNESS WHEREOF, the parties have executed this Agreement at St. Paul, Minnesota this 29th day of October 2004.

Lessor: **DFG Capital L.L.C.**          Lessee: **JetChoice II, LLC**

By: _[signature]_                        By: _____

Name: _Michael E. Dougherty_             Name: _____

Title: _Manager_                         Title: _____

Date: _10/29/04_                         Date: _____

Witness: _[signature]_                   Witness: _____

Date: _10/29/04_                         Date: _____

LI

# SCHEDULE 1

### PURSUANT TO SECTION 1 OF THE AIRCRAFT LEASE.
### AIRCRAFT, ENGINES, DOCUMENTS, OTHER EQUIPMENT AND ACCESSORIES.

## A. AIRCRAFT AND ENGINES

Aircraft Make and Model: Dassault Falcon 50-40
Manufacturer's Serial Number: 25
U.S. Registration Number: N502EZ (to be changed to N753JC)

ENGINES: Three (3) Garrett AiResearch Model TFE-731-40 engines bearing manufacturer's serial numbers 115393, 115394, and 115395; each of which has 750 or more rated takeoff horsepower or the equivalent thereof

## B. MAINTENANCE STATUS

1. Airframe:

Total Airframe Hours: 5469
Total Airframe Cycles: 6197

2. Engines

<u>Left</u>
Serial Number: 115393
Total Hours since new: 25
Total Cycles since new: 20
Time since CZI: N/A
Time since MPI: N/A

<u>Center</u>
Serial Number: 115394
Total Hours since new: 25
Total Cycles since new: 20
Time since CZI: N/A
Time since MPI: N/A

<u>Right</u>
Serial Number: 115395
Total Hours since new: 25
Total Cycles since new: 20
Time since CZI: N/A
Time since MPI: N/A

# SCHEDULE 1
# (CONTINUED)

## AVIONICS INVENTORY

Collins Pro-Line 21
Dual Collins VHF-4000 Comm
Dual Collins HF-9000
Dual Collins NAV-4000
Aircell ST-3500 w/ SATCOM
Collins APS-4000 Autopilot
Triple Collins AHS-3000 AHRS
Dual Collins ADC-850
Dual Collins AVSAT 6100 FMS
Dual Collins ADF-462
Honeywell Mark V EGPWS w/windshear
Dual Collins DME-4000
Collins TWR-850 Radar
Dual Collins TDR-94D Mode S Transponder
Universal CVR-120
Dual Collins GPS-4000A (12 channel)
IDC Encoder, Collins
TCAS-4000 TCAS II
Goodrich GDC-3000 Emergency Attitude/Mach-Airspeed/Altitude Display system with
ADC 3000 Standby Airdata Computer
Jetcall-2 SELCAL
Dual Baker Audio System
Dual Davtron 877 Clocks
Securaplane XLT-245A Emergency Battery Power System
Artex ELT w/ nav interface
RVSM certified
MNPS
RNP10
FM immunity
8.33 spacing
ALT-55 Radalt

# APPENDIX A

Dassault Falcon 50
Serial Number 25

## CONFIDENTIAL TERMS
(TO BE OMITTED FROM FAA FILING COPY)

The following terms and in the Lease shall, for purposes of the Lease and all exhibits thereto, have the additional meanings assigned to them or shall be the amounts as follows:

**A. RENTALS.**

1. Basic Rent:

$45,000.00 per month payable to Lessor. Lessor for the Interest leased under this Lease. (Lessee acknowledges that additional rent will be payable to Co-Owner with respect to the lease of the Additional Interests).

Basic Rent is payable monthly, in advance, beginning with first payment on _____, 2004 and payable on the monthly anniversary Date throughout the Term.

2. Engine Reserve Payments:

xxx.xx per flight hour payable by Lessee. Pursuant to the MSP Contract (#xxxxx) and Section 3(b) of this Lease. Current rate for the calendar year 2004 is $xxx.xx per engine hour. MSP payments due from Lessee shall be paid to Lessor on or before the 10[th] of the month in arrears. MSP calculations due from Lessee shall start at Aircraft Total Time at time of delivery as documented in Appendix C hereto.

3. Airframe Reserve Payments:

Not Required

4. Security Deposit:

Not Required

# APPENDIX B

## DASSAULT FALCON 50
## SERIAL NUMBER 25

## MEMORANDUM OF DELIVERY

The undersigned hereby acknowledges that on this 29th day of October, 2004, at St. Paul, MN, did receive and accept delivery of that certain Dassault Falcon 50, serial number 25, registration number N502EZ, including its engines, **serial numbers 115393, 115394, and 115395**, and other appliances, parts, additions, accessories, instruments, components and other items of equipment now installed thereon as per attached specification, (collectively the "Aircraft"); and together with all available log books and pilot manuals. The undersigned does hereby further acknowledge and agree that the aforesaid Aircraft is in full compliance with the provisions of the Aircraft Lease Agreement dated as of October 29 2004 by and between the undersigned and DFG Capital L.L.C., as Lessor.

TAT: _____

TAC: _____

Lessee hereby accepts delivery of the Aircraft "AS IS" and "WHERE IS

Executed as of the time and date first shown above.


**JET CHOICE II, LLC**
Lessee


By: _____

Name: _____

Title: _CHIEF MGR_____

Date: _10-28-04_____


Witness: _____

Date: _10-28-04_____

LI